IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
-----------------------------------------)
OCEANA, INC.                             )
2501 M Street, NW, Suite 300             )
Washington, DC 20037-1311                )
                                         )
                        Plaintiff,       )
                                         )
            v.                           )          Civil Action No. _____
                                         )
CARLOS M. GUTIERREZ, in his official     )
capacity as Secretary of the United States )
Department of Commerce                   )
Office of the Secretary                  )
Room 5858                                )
14th Street and Constitution Ave., NW    )
Washington, DC 20230;                    )
                                         )
NATIONAL OCEANIC AND                     )
ATMOSPHERIC ADMINISTRATION               )
Department of Commerce                   )
Room 5128                                )
14th Street and Constitution Ave., NW    )
Washington, DC 20230; and                )
                                         )
NATIONAL MARINE FISHERIES SERVICE  )
Department of Commerce                   )
Room 14636                               )
1315 East-West Highway                   )
Silver Spring, MD 20910                  )
                                         )
                        Defendants.      )
_____)
```

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.   This case concerns the failure of defendants, the National Marine Fisheries Service, et al., (hereinafter, "the Fisheries Service") to protect a species listed as threatened under the Endangered Species Act by failing to monitor and assess the impact of fishing for Atlantic sea scallops on loggerhead sea turtles.  The Fisheries Service has the conflicting duties of

authorizing commercial fishing and protecting threatened and endangered species from commercial fishing.  These conflicting duties have resulted in it acting, in this case, like the fox guarding the hen house.

2.   Scallop dredges and scallop trawls fishing in the waters off the Mid-Atlantic states catch and kill hundreds of loggerhead sea turtles every year.

3.   The Endangered Species Act requires the Fisheries Service to ensure that scallop fishing does not jeopardize the continued existence of loggerhead sea turtles.  Under the Act, the Fisheries Service must (a) estimate how many loggerhead sea turtles scallop vessels catch and kill; (b) limit the catching and killing to a level that the agency can insure is not likely to jeopardize the continued existence of the species; (c) monitor the catching and killing; and (d) take action to protect loggerheads if the catching or killing exceeds authorized levels.

4.   On December 15, 2004, the Fisheries Service issued a Biological Opinion which purported to fulfill its duties under the Endangered Species Act to insure that continued scallop fishing is not likely to jeopardize loggerhead sea turtles with extinction.  Fisheries Service, Endangered Species Act Section 7 Consultation on the Atlantic Sea Scallop Fishery Management Plan [Consultation No. F/NER/2004/01606] (December 15, 2004) (the "2004 Biological Opinion").

5.   On November 1, 2005, the Fisheries Service reinitiated a formal consultation that resulted in the issuance of the new Biological Opinion, dated September 18, 2006, challenged in this case.  Fisheries Service, Endangered Species Act Section 7 Consultation on the Atlantic Sea Scallop Fishery Management Plan [Consultation No. F/NER/2005/06066] (September 18, 2006) (the "2006 Biological Opinion").

6.   Even though the 2004 Biological Opinion required the agency to collect enough data to make a statistically reliable estimate of the number of loggerheads caught and killed by scallop trawls, and even though the agency had concluded, in a study contemporaneous with the new 2006 Biological Opinion, that trawls fishing in the same area for other species killed over twelve times the number of loggerhead sea turtles that the Fisheries Service had previously acknowledged, the 2006 Biological Opinion did not contain a rational estimate of the number of loggerhead sea turtles that scallop trawls catch and kill.

7.   In addition, shortly before issuing the 2006 Biological Opinion, the Fisheries Service issued a new rule that undermined the system established in the 2004 and earlier Biological Opinions for monitoring the impact of scallop dredges on loggerhead sea turtles.  71 Fed. Reg. 50361 (Aug. 25, 2006).  The new rule required scallop vessels to modify their dredge gear so that most future takes would occur underwater where they would not be observed.  Rather than adopting a new monitoring system that would continue to collect data on the number of loggerhead sea turtles that scallop dredges catch and kill, the Fisheries Service flouted the Endangered Species Act and regulations by providing in the new 2006 Biological Opinion that the agency did not have to monitor the actual number of loggerhead sea turtles that scallop dredges catch and kill.

8.   Oceana brings this lawsuit to compel the agency to reconsider its arbitrary and irrational analysis in the 2006 Biological Opinion, to comply with its duties to monitor the catching and killing of sea turtles by scallop vessels, and to take the measures necessary to allow scallop fishing to continue while insuring that scallop fishing is not likely to jeopardize threatened loggerhead sea turtles with extinction.

**JURISDICTION AND VENUE**

9.   Oceana brings this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

10. The District Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States" and 28 U.S.C. § 1361, which grants the district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

12. The District Court may hold unlawful and set aside agency action pursuant to 5 U.S.C. § 706 and issue a declaratory judgment and any further necessary or proper relief pursuant to 28 U.S.C. §§ 2201-2202.

**PARTIES**

13. Plaintiff Oceana is a non-profit international advocacy organization dedicated to protecting and restoring the world's oceans through policy, advocacy, science, law, and public education.  Oceana has over 285,000 members and supporters around the world, including over 59,000 members and supporters in the coastal states from Maine to North Carolina.  Oceana is organized under the laws of the District of Columbia, and maintains its headquarters in Washington, DC.  It has offices or staff in five states (Alaska, California, Massachusetts, New York, and Oregon) and three foreign countries (Chile, Belgium, and Spain).  Through its policy, scientific, litigation, and grass-roots activities, Oceana has been a prominent advocate for protecting threatened and endangered marine species such as loggerhead sea turtles and promoting environmentally and economically sustainable fisheries.  Oceana has participated in

administrative proceedings before government agencies, litigated before courts, and issued reports to the public, all in the service of protecting marine resources and wildlife.

14. Oceana's members, supporters, staff, officers, and directors (hereinafter, "members") use and enjoy the oceans for numerous activities, including fishing, scuba diving, snorkeling, boating, swimming, beach walking, research, and study. Oceana's members value a healthy marine environment. They are concerned about and directly affected by environmental injury caused by dirty fishing practices, including practices that catch and kill threatened loggerhead sea turtles.

15. Oceana and its members suffer direct and immediate injury as a result of the Fisheries Service's failure to protect loggerhead sea turtles. Oceana's members participate in loggerhead sea turtle viewing opportunities, such as observing sea turtles while boating, visiting sea turtle nesting sites, scuba diving, and snorkeling. Oceana's members intend to continue to study, observe, and attempt to observe loggerhead sea turtles in the future. They derive scientific, recreational, conservation, spiritual, and aesthetic benefits from the existence of loggerhead sea turtles in the wild. These interests have been impaired by the agency's conduct and, unless the Court grants the relief requested herein, will continue to be impaired, as the existence of loggerhead sea turtles continues to be placed in jeopardy by scallop fishing.

16. Defendant Carlos M. Gutierrez is Secretary of the United States Department of Commerce. He is sued in his official capacity as the chief officer of the federal agency charged by the United States Congress with protecting threatened and endangered species in the marine environment, including loggerhead sea turtles.

17. Defendant National Oceanic and Atmospheric Administration ("NOAA") is an agency of the United States Department of Commerce with supervisory responsibility for the

National Marine Fisheries Service. The Secretary of Commerce has delegated responsibility for protecting threatened and endangered species in the marine environment to NOAA, which in turn has sub-delegated that responsibility to the National Marine Fisheries Service.

18. Defendant National Marine Fisheries Service is an agency of the United States Department of Commerce that has been delegated the primary responsibility to protect threatened and endangered species in the marine environment.

## STATUTORY AND REGULATORY BACKGROUND

### I.     THE ENDANGERED SPECIES ACT

19. The Endangered Species Act, 16 U.S.C. §§ 1531-1544, has been described as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The Act reflects "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species." *Id.* at 185.

20. Section 9 of the Endangered Species Act and federal regulations implementing the Act provide that it is unlawful for any "person" to "take" a threatened or endangered species within the United States or the territorial sea of the United States or upon the high seas. 16 U.S.C. § 1538(a)(1)(B), (C); 50 C.F.R. §§ 17.21, 17.31.

21. Section 3 of the Act states that "[t]he term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct," 16 U.S.C. § 1532(19). The term "person" includes, *inter alia*, "any officer, employee, agent, department, or instrumentality of the Federal Government." *Id*. § 1532(13).

22. A federal agency is liable under Section 9 if it authorizes an activity that will result in takes because "[t]he statute not only prohibits the acts of those parties that directly exact the taking, but also bans those acts of a third party that bring about the acts exacting a taking."

*Strahan v. Coxe*, 127 F.3d 155, 163 (1st Cir. 1997).  Thus, "a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the [Endangered Species Act]." *Id.*

23. An agency proposing to authorize an action (the "action agency") that may affect an endangered or threatened species must consult with the agency responsible for protecting the species (the "expert agency") to insure that the action and its anticipated takes are "not likely to jeopardize the continued existence of any endangered species or threatened species." *Id.* § 1536(a)(2).

24. For federally-authorized fishing activities affecting protected marine species, the Fisheries Service is both the action and the expert agency.

25. At the conclusion of the consultation, the expert agency issues a biological opinion determining whether the proposed action is likely to jeopardize the continued existence of the threatened or endangered species. *Id.* § 1536(b)(3).

26. If the expert agency finds "no jeopardy," the biological opinion will allow the proposed action to go forward subject to certain protections.  Specifically, pursuant to Section 7(b)(4), the biological opinion must include an incidental take statement specifying reasonable and prudent measures necessary to minimize the harm of any incidental takes, and terms and conditions necessary to implement the reasonable and prudent measures. *Id.* § 1536(b)(4).

27. The incidental take statement terms and conditions must include requirements to report on the actual impact of the action on the species. *Id.* § 1536(b)(4)(iv); 50 C.F.R. § 402.14(i)(1)(iv), (i)(3).

28. If the action agency complies with the terms and conditions contained in the biological opinion, it may authorize the proposed activity without violating Section 9.  The

agency is liable under Section 9, however, if it authorizes the proposed activity but fails to comply with any term and condition.  16 U.S.C. § 1536(o)(2).

## II.    THE ADMINISTRATIVE PROCEDURE ACT

29. The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  *Id.* § 704.

30. In an APA suit, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be - - (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2).

## FACTUAL AND PROCEDURAL BACKGROUND

## I.    THREATENED LOGGERHEAD SEA TURTLES ARE IMPORTANT TO THE MARINE ECOSYSTEM

31. Loggerhead sea turtles range from 34 to 49 inches long and weighs from 176 to 440 pounds.  James R. Spotila, *Sea Turtles: A Complete Guide to their Biology, Behavior, and Conservation* 7 (The Johns Hopkins University Press 2004).

32. The loggerhead's carapace (upper shell) is reddish-brown and its plastron (lower shell) is dull brown to yellowish.  *Id.*  The shell is like a "little moving island[]" because it is covered with "algae, barnacles, clams, small skeleton shrimp, and a host of other species."  *Id.* at 3 (continued on 9).

33. The loggerhead's name comes from it large head with "strong crushing jaws."  *Id.* at 7.

34. "The loggerhead sea turtle is a keystone species in the world's oceans." *Id.* at 177. As carnivores, loggerheads break up the shells of invertebrates, making calcium available for other animals. *Id.* By digging around on the seafloor, loggerheads may control the nature of the living community in the areas of the ocean in which they forage. *Id.* Because a large array of plants and animals attach to their shells and ride through the oceans with them, "[e]ssentially, loggerheads are swimming reefs." *Id.*

35. The loggerhead's "stronghold is in the Atlantic Ocean where its largest population … nests in south Florida." *Id.* at 178. If small loggerhead populations elsewhere in the world "are lost, the genetic diversity of the species will decrease and survival will be tied to the large regional populations in the southern United States and north Indian Ocean." *Id.*

36. Female loggerheads nest on beaches along the east coast of Florida, Georgia, and South Carolina from May through August. *Id.* at 23, 26. The hatchlings are born in the late summer and early autumn. *Id.* at 23. After birth, they head into the ocean, swimming out to the Gulf Stream, eventually finding and staying with rafts of floating *Sargassum* seaweed. *Id.* The loggerheads and the seaweed travel on the group of currents known as the North Atlantic gyre, floating east across the Atlantic toward Portugal, south toward the west coast of Africa, and then west back to the United States. *Id.* The entire journey can take years. *Id.*

37. When the loggerhead juvenile reaches a size of about 18 to 20 inches long, it returns to the United States Atlantic coast, migrating to shallow inshore waters. *Id.* at 174. The turtles become benthic, or bottom, feeders, eating crabs and shellfish. *Id.*

38. The annual survival rate drops as the loggerheads move to near shore waters and become vulnerable to fishing and other human threats. *Id.* at 175.

39. A loggerhead does not become mature enough to reproduce until it reaches an age of 25 to 35 years.  *Id.* at 178.

40. The loggerhead sea turtle was listed as threatened throughout its global range on July 28, 1978.  50 C.F.R. § 17.11.

## II.     SCALLOP VESSELS CATCH AND KILL THREATENED LOGGERHEAD SEA TURTLES

41. Vessels in the Atlantic Sea Scallop Fishery fish year round for scallops in the waters off the Atlantic Coast of the United States, from Maine to North Carolina.  2006 Biological Opinion at 5.

42. Scallop dredge fishing vessels generally use two dredges consisting of a 15-foot wide frame towing a metal-ring chain bag into which scallops and other catch are swept.  *Id.* at 52-53. A standard frame weighs about 2500 pounds and the chain bag (empty) weighs an additional 2000 pounds.  *Id.* at 53.

43. The Fisheries Service anticipates that scallop dredges catch up to 749 loggerhead sea turtles each year and kill up to 479 of them.  *Id.* at 86.

44. Scallop trawl fishing vessels tow a large conical net along the seafloor, using heavy "doors" attached to the towing cables to keep the mouth of the net open while it is deployed.  *Id.* at 54.  The "sweep," or "foot-rope," running along the bottom of the net mouth is limited to no more than 144 feet in length.  *Id.*

45. Even though only a small percentage of total fishing trips carried at-sea observers, the observers reported that scallop trawls caught 5 loggerheads in 2005.  *Id.* at 71.

III.   **NOTWITHSTANDING THE AVAILABLE DATA, THE 2006 BIOLOGICAL OPINION DID NOT EXTRAPOLATE FROM OBSERVED LOGGERHEAD SEA TURTLE TAKES TO CALCULATE SEA TURTLE CATCH FOR ALL SCALLOP TRAWLS**

46. The Fisheries Service reinitiated consultation to develop the new 2006 Biological Opinion, because (1) the number of loggerhead sea turtles observed caught in scallop trawls in 2005 exceeded the number anticipated in the 2004 Biological Opinion and (2) the agency determined that scallop dredges had caught a Kemp's ridley and a green sea turtle even though the 2004 Biological Opinion deemed takes of those species to be unlikely.  2006 Biological Opinion at 3.

47. The 2004 Biological Opinion required that the Fisheries Service provide sufficient observer coverage on scallop trawls "to obtain a statistically reliable estimate of the number of sea turtles taken."  *Id.*

48. The 2006 Biological Opinion stated that "[t]he 2005 fishing year is the first for which the NEFSC [Northeast Fisheries Science Center] can provide an estimate of sea turtle bycatch in this [trawl] sector of the scallop fishery."  *Id.* at 71.

49. Nonetheless, the 2006 Biological Opinion asserted that "the estimate of sea turtle bycatch in the scallop trawl fishery is not yet available."  *Id.*

50. On information and belief, the Fisheries Service could have, but chose not to, analyzed the 2005 fishing year data to estimate the number of loggerhead sea turtles taken each year by scallop trawls.

51. In a paper issued in September 2006, the Fisheries Service estimated the number of sea turtles annually taken by all trawl fishing in the Mid-Atlantic except for scallop trawl fishing. Kimberly T. Murray, *Estimated Average Annual Bycatch of Loggerhead Sea Turtles (Caretta*

*caretta) in U.S. Mid-Atlantic Bottom Otter Trawl Gear, 1996-2004*, Northeast Fisheries Science

Center Reference Document 06-19 2 (September 2006) (hereinafter "Murray Report.").

52. The Murray Report estimated that the average annual catch of loggerhead sea turtles

in the Mid-Atlantic trawl fisheries (except for scallop trawls) was 616. *Id.* at 11.

53. Taken together, the biological opinions issued by the Fisheries Service for Mid-

Atlantic trawl fisheries (including scallop trawls) currently anticipate only 49 takes of loggerhead

sea turtles, over twelve times lower than the Murray Report estimate. Elizabeth Griffin, *et al.*,

*Net Casualties* 18 (October 2006 Oceana).

54. The Murray Report developed a method to estimate the number of sea turtles that

would be caught by trawl vessels, regardless of target species, based on the latitude where the

vessel fished, sea surface temperature, and whether the trawl net was equipped with a turtle

excluder device. Murray Report at 10; *id.* at 21 (table 5); *id.* at 23 (table 7).

55. On information and belief, the Fisheries Service could have used, but chose not to

use, the methodology in the Murray Report to estimate the number of loggerhead sea turtles

taken each year by scallop trawls.

56. The 2006 Biological Opinion stated that "for scallop *trawl* gear, NMFS

anticipates…annual take of up to 5 loggerhead" sea turtles. 2006 Biological Opinion at 86

(emphasis in original).

### IV.    THE MONITORING PROVISION OF THE 2006 BIOLOGICAL OPINION DOES NOT ESTABLISH A METHOD BY WHICH THE FISHERIES SERVICE CAN MONITOR SEA TURTLE TAKES IN SCALLOP DREDGES, EVEN THOUGH SUCH METHODS ARE AVAILABLE

57. The 2004 Biological Opinion contained a "reasonable and prudent measure,"

requiring the Fisheries Service to "require observer coverage for the scallop fishery at a level

necessary to obtain statistically reliable information on sea turtle bycatch in the scallop fishery." 2004 Biological Opinion at 80 (reasonable and prudent measure four).

58. The 2004 Biological Opinion contained a term and condition requiring the Fisheries Service to implement reasonable and prudent measure four by continuing observer coverage for scallop dredges "to assess the continued bycatch of sea turtles in the fishery." *Id.* at 81 (term and condition four).

59. On May 27, 2005, the Fisheries Service proposed a rule to require vessels fishing for scallops with dredges in the Mid-Atlantic region to block the mouth of the dredge bag with a grid of chains. 70 Fed. Reg. 30660 (May 27, 2005).

60. These turtle chains would prevent the dredge from capturing sea turtles, although the turtle chains would not reduce the number of sea turtles that the dredge collided with, and therefore would not reduce the number of takes. *Id.* at 30662.

61. Oceana commented to the agency that the rule would require monitoring of takes by underwater video camera. Letter from Eric A. Bilsky to Mary A. Colligan 7 (June 24, 2005).

62. While the 2006 Biological Opinion was under development, the agency asked its scientific experts to examine various methods of monitoring takes of sea turtles by dredges modified with turtle chains. Memorandum from John Boreman, Fisheries Service, to Patricia A. Kurkul, Fisheries Service 1 (Mar. 6, 2006) (hereinafter "Boreman Memo").

63. On information and belief, the agency did not ask its scientific staff to consider the alternative of monitoring takes by underwater video camera. *See Monitoring Sea Turtle Bycatch in the Atlantic Sea Scallop Dredge Fishery with Chain Mats* 1, (attached to Boreman Memo) (hereinafter "*Monitoring Sea Turtle Bycatch*") (omitting from its list of monitoring techniques considered by the staff the use of underwater video cameras).

64. The agency scientific staff concluded, after considering alternatives other than underwater video cameras, that, "[a]fter considering a variety of different fishery-dependent and -independent approaches, our determination is that there is no approach that is entirely scientifically adequate." Boreman Memo at 1.

65. In particular, the staff concluded that, if scallop dredges are equipped with turtle chains, at-sea observers would not be adequate for monitoring takes because "the method would likely provide few observed takes . . . and the method would not provide a take estimate at all comparable to the [incidental take statement]" in the Biological Opinion. *Monitoring Sea Turtle Bycatch* at 2.

66. The scientific staff considered "an observer program based on observing dredges with the chain mat [turtle chains] removed," and using the collected data to estimate takes. *Id.*

67. The scientific staff noted that observing dredges fishing without turtle chains would have two benefits: the agency could generate a take estimate comparable to the incidental take statement and the agency could continue to analyze factors affecting takes. *Id.*

68. The scientific staff also listed weaknesses of observing dredges fishing without turtle chains, including such speculative weaknesses as that take estimates "*might* not be comparable" to takes with turtle-chain equipped gear; it *might* be difficult to remove the turtle chains prior to the observed trips; permitting to authorize the observer program without turtle chains "*may* be problematical," and industry acceptance "*may* be very low." *Id.* (emphasis added).

69. The scientific staff also noted that the observer program would not be able to measure compliance with the turtle chain rule if observed trips did not use turtle chains (although measuring compliance is not the role of the observer program) and that continuing to use observers would not lower the expenses of the current observer program. *Id.*

70. The scientific staff also considered the option of estimating sea turtle takes based on bycatch rates from prior years and the amount of fishing taking place in the current year.  *Id.*

71. The scientific staff stated that "we cannot support or recommend any one of these approaches."  *Id.* at 3.

72. Notwithstanding the staff conclusion, the cover memo accompanying the staff analysis recommended that the agency assume that the level of takes is below the incidental take statement level and not reinitiate consultation unless "changes will occur in the fishery that will increase the probability of sea turtle interactions (e.g., if considerable additional effort is expected to be directed into areas of proven high takes)."  Boreman Memo at 2.

73. On August 25, 2006, without modifying the still-operative 2004 Biological Opinion, the Fisheries Service promulgated a final rule requiring vessels fishing for scallops with dredges in the Mid-Atlantic region to fit their dredges with turtle chains.  71 Fed. Reg. 50361 (Aug. 25, 2006).

74. Subsequently, the Fisheries Service adopted, without public announcement, the 2006 Biological Opinion.

75. Without public announcement, the 2006 Biological Opinion was placed on a web site operated by the agency on or about October 27, 2006.

76. Oceana's counsel was informed by agency counsel of the issuance of the 2006 Biological Opinion on November 17, 2006.

77. Unlike the 2004 Biological Opinion, the 2006 Biological Opinion does not include a reasonable and prudent measure requiring the Fisheries Service to "require observer coverage for the scallop fishery at a level necessary to obtain statistically reliable information on sea turtle

bycatch in the scallop fishery." *Compare* 2004 Biological Opinion at 80 (reasonable and prudent measure four) *with* 2006 Biological Opinion at 87 (reasonable and prudent measures).

78. The 2006 Biological Opinion included a term and condition entitled "Monitoring." 2006 Biological Opinion at 88-89.

79. The "Monitoring" term and condition acknowledged that the new rule requiring the use of turtle chains rendered the existing system for monitoring sea turtle takes by scallop dredges ineffective, because at-sea observers could no longer observe sea turtles caught in the dredge bag. *Id.* at 88.

80. The "Monitoring" term and condition relied on the analysis in the Boreman Memo and the accompanying *Monitoring Sea Turtle Bycatch* analysis. *Id.* at 88-89.

81. Rather than adopting a method to actually monitor the number of sea turtle takes by scallop dredges, the "Monitoring" term and condition stipulated that the agency would consider the incidental take statement to have been exceeded "if the total number of dredge hours in Mid-Atlantic waters . . . during the period of May through November of any scallop fishing year is significantly greater than the total number of dredge hours for Mid-Atlantic waters . . . during the same period of 2003." *Id.* at 89.

## FIRST CLAIM FOR RELIEF

### THE FISHERIES SERVICE VIOLATED THE  ENDANGERED SPECIES ACT AND THE APA BY ISSUING A BIOLOGICAL OPINION AND INCIDENTAL TAKE STATEMENT THAT FAILED TO REASONABLY ESTIMATE THE TOTAL NUMBER OF LOGGERHEAD SEA TURTLES CAUGHT BY SCALLOP TRAWLS

82. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 81 in this claim for relief.

83. Section 7(a)(2) of the Endangered Species Act requires federal agencies to "insure that any action authorized, funded, or carried out by [an agency] . . . is not likely to jeopardize the continued existence of any endangered species or threatened . . ." 16 U.S.C. § 1536(a)(2).

84. To accomplish this goal, the action agency must consult with the expert agency to insure that its action will not likely jeopardize the continued existence of the species. *Id*. § 1536(a)(2); 50 C.F.R. § 402.14(a).

85. As a result of the consultation, the expert agency issues a biological opinion that must detail "how that agency action affects the species." 16 U.S.C. § 1536(b)(3)(A).

86. If the expert agency anticipates that incidental takes will result from the action, but that it can insure that the action will not jeopardize the species, the biological opinion must contain an incidental take statement. *Id*. § 1536(b)(4).

87. The incidental take statement "[s]pecifies the impact, i.e., the amount or extent, of such incidental taking on the species." 50 C.F.R. § 402.14(i).

88. Accordingly, the 2006 Biological Opinion was required to specify the amount of loggerhead sea turtles caught and killed by scallop trawls.

89. The 2006 Biological Opinion does not take a reasonable approach to estimating the number of loggerhead sea turtles that scallop trawls catch and kill.

90. The Fisheries Service made no effort in the 2006 Biological Opinion to investigate reasonable alternatives for estimating scallop trawl takes, including the alternative of analyzing the 2005 observer data and the alternative of using the methodology for estimating trawl takes used in the Murray Report, nor did it explain why it did not undertake such an analysis.

91. Furthermore, in choosing the most reliable method of estimating scallop trawl takes, the Fisheries Service made no attempt in the 2006 Biological Opinion to analyze the relative

reliability of various alternatives, including (a) the alternative chosen, estimating the total number of takes to be equal to the observed takes only, (b) analyzing the 2005 observer data to develop an estimate, and (c) using the methodology for estimating trawl takes used in the Murray Report.

92. Accordingly, in conducting an arbitrary and capricious analysis of scallop-trawl sea-turtle takes in the 2006 Biological Opinion and incidental take statement in its role as expert agency, the Fisheries Service violated the Endangered Species Act and the APA.

93. The Fisheries Service's violations of the Endangered Species Act and the APA are causing irreparable injury to the plaintiff for which the plaintiff has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

**THE FISHERIES SERVICE DID NOT ACT IN ACCORDANCE WITH ITS OWN REGULATIONS ISSUED TO IMPLEMENT THE ENDANGERED SPECIES ACT, IN VIOLATION OF THE APA, BY ISSUING A BIOLOGICAL OPINION THAT DOES NOT CONTAIN REPORTING REQUIREMENTS SUFFICIENT TO IMPLEMENT THE INCIDENTAL TAKE STATEMENT CONTAINED IN THE BIOLOGICAL OPINION**

94. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 93 in this claim for relief.

95. The Fisheries Service's regulations concerning formal consultation and the issuance of biological opinions require that the Fisheries Service, as action agency, monitor the impacts of authorized incidental takes by reporting on the progress of the action and its impact on the species. 50 C.F.R. § 402.14(i)(3).

96. The Fisheries Service's regulations further require that if, during the course of the action, the amount of incidental taking exceeds the amount authorized by the incidental take statement in the biological opinion, the Fisheries Service, as action agency, must immediately

reinitiate consultation, requesting the Fisheries Service, as expert agency, to develop a new biological opinion. *Id.* § 402.13(i)(4).

97. The 2006 Biological Opinion is not in accordance with the Fisheries Service's own regulations, because the 2006 Biological Opinion authorizes incidental takes without requiring actual monitoring of takes from scallop dredges.

98. Because the 2006 Biological Opinion is not in accordance with the Fisheries Service's own regulations, it is in violation of the APA.

99. The Fisheries Service's violations of its Endangered Species Act regulations and the APA are causing irreparable injury to the plaintiff for which the plaintiff has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

### THE FISHERIES SERVICE VIOLATED THE ENDANGERED SPECIES ACT AND THE APA BY ARBITRARILY AND CAPRICIOUSLY FAILING TO CONSIDER FEASIBLE METHODS FOR MONITORING SEA-TURTLE TAKE BY SCALLOP DREDGES

100. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 99 in this claim for relief.

101. The Fisheries Service's decision, in the 2006 Biological Opinion, not to require actual monitoring of scallop-dredge takes of sea turtles was arbitrary and capricious, because neither the 2006 Biological Opinion nor the supporting Boreman Memo and *Monitoring Sea Turtle Bycatch* analysis stated a rational basis for the conclusory assertion that it was not feasible to require scallop dredge vessels to remove turtle chains during trips monitored by at-sea observers.

102. The Fisheries Service's decision, in the 2006 Biological Opinion, not to require actual monitoring of scallop-dredge takes of sea turtles was arbitrary and capricious, because

neither the 2006 Biological Opinion nor the supporting Boreman Memo and *Monitoring Sea Turtle Bycatch* analysis considered the feasible alternative of monitoring scallop-dredge takes through the use of underwater video cameras.

103.   The Fisheries Service's arbitrary and capricious analysis in the 2006 Biological Opinion of whether to require actual monitoring of scallop-dredge takes of sea turtles violated the Endangered Species Act and the APA.

104.   The Fisheries Service's violations of the Endangered Species Act and the APA are causing irreparable injury to the plaintiff for which the plaintiff has no adequate remedy at law.

**PRAYERS FOR RELIEF**

1.   Enter a declaratory judgment that the Fisheries Service's analysis of scallop-trawl sea-turtle takes in the 2006 Biological Opinion and incidental take statement was arbitrary and capricious and therefore violated the Endangered Species Act and the APA.

2.   Enter a declaratory judgment that the Fisheries Service's decision not to require actual monitoring of scallop-dredge takes of sea turtles was in violation of the agency's own regulations and was arbitrary and capricious, in violation of the Endangered Species Act and that APA.

3.   Enter an order vacating the 2006 Biological Opinion and directing the agency to reinitiate consultation for the Atlantic Sea Scallop Fishery.

4.   Issue such injunctive relief as is appropriate to allow the continued prosecution of the Atlantic Sea Scallop Fishery during the remand period while preventing irreparable harm to the environment.

5.   Enter an order awarding Oceana its fees, expenses, and costs.

6.   Provide such other and further relief as the Court deems necessary, just, or proper.

DATED this 19th day of January, 2007.

Respectfully submitted,

/s/ Eric A. Bilsky
_____

Eric A. Bilsky
DC Bar No. 433612
OCEANA, INC.
2501 M Street, NW, Suite 300
Washington, DC 20037-1311

JS-44
(Rev. 1/05 DC)

# CIVIL COVER SHEET

## I. (a) PLAINTIFFS

OCEANA, INC.

1001

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** _____ 11001
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS

CARLOS M. GUTIERREZ, in his official capacity as Secretary of the U.S. Department of
Commerce;
National Oceanic and Atmospheric Administration;
National Marine Fisheries Service

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Eric A. Bilsky
OCEANA, INC.
2501 M Street, NW, Suite 300
Washington, DC 20037-1311
202-833-3900

AT

CASE NUMBER   1:07CV00142

JUDGE: Reggie B. Walton

DECK TYPE: Administrative Agency Rev

DATE STAMP: 01/19/2007

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government
Plaintiff

Ⓞ 2 U.S. Government
Defendant

O 3 Federal Question
(U.S. Government Not a Party)

O 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSI
FOR PLAINTIFF A

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| O A. Antitrust | O B. Personal Injury/ Malpractice | Ⓞ C. Administrative Agency Review | O D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☒ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

## O E. General Civil (Other)   OR   O F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

○ **G.** *Habeas Corpus/ 2255*

☐ 530 Habeas Corpus-General
☐ 510 Motion/Vacate Sentence

○ **H.** *Employment Discrimination*

☐ 442 Civil Rights-Employment
(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

○ **I.** *FOIA/PRIVACY ACT*

☐ 895 Freedom of Information Act
☐ 890 Other Statutory Actions
(if Privacy Act)

*(If pro se, select this deck)*

○ **J.** *Student Loan*

☐ 152 Recovery of Defaulted Student Loans
(excluding veterans)

○ **K.** *Labor/ERISA (non-employment)*

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Labor Railway Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

○ **L.** *Other Civil Rights (non-employment)*

☐ 441 Voting (if not Voting Rights Act)
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights
☐ 445 American w/Disabilities-Employment
☐ 446 Americans w/Disabilities-Other

○ **M.** *Contract*

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholder's Suits
☐ 190 Other Contracts
☐ 195 Contract Product Liability
☐ 196 Franchise

○ **N.** *Three-Judge Court*

☐ 441 Civil Rights-Voting
(if Voting Rights Act)

**V. ORIGIN**

◉ 1 Original Proceeding
○ 2 Removed from State Court
○ 3 Remanded from Appellate Court
○ 4 Reinstated or Reopened
○ 5 Transferred from another district (specify)
○ 6 Multi district Litigation
○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

This action arises under the judicial review provisions of the APA, 5 U.S.C. §§ 701-706, for violations of the APA and federal environmental laws.

**VII. REQUESTED IN COMPLAINT**

CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐

DEMAND $ _____   Check YES only if demanded in complaint

**JURY DEMAND:**   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 1/19/2007     SIGNATURE OF ATTORNEY OF RECORD *Eric A. Schley*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.