## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCEANA, INC., | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) Civ. No. 1:07-cv-00142-RBW |
| **v.** | ) |
| | ) |
| THE HONORABLE | ) |
| CARLOS M. GUTIERREZ, *et al.* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

### MOVANT FISHERIES SURVIVAL FUND'S
### MOTION TO INTERVENE IN THIS ACTION

Pursuant to Fed. R. Civ. P. 24 and for the reasons set forth in its accompanying Memorandum of Points and Authorities, Movant, Fisheries Survival Fund ("FSF"), respectfully submits this Motion to intervene as of right or, in the alternative, for permissive intervention in the above-captioned action under Fed. R. Civ. P. 24(a)(2) and (b)(2). As set forth in more detail in the attached Memorandum of Points and Authorities, including the supporting declaration, FSF is an association, whose participants include approximately two hundred full-time Atlantic sea scallop fisherman, which seeks to intervene in this litigation in order to protect its interests and those of its participants who rely upon the revenue generated from commercial scallop fishing activities.

Pursuant to Local Rule 7(m), counsel for FSF has conferred with counsel for Plaintiff and Defendants in this action. Both parties take no position on FSF's Motion to Intervene.

For the foregoing reasons, FSF respectfully requests that its Motion to Intervene be granted.

Dated: March 30, 2007                    Respectfully submitted,

David E. Frulla  (D.C. Bar No. 414170)
Shaun M. Gehan (D.C. Bar No. 483720)
Daniel S. Blynn (D.C. Bar No. 488934)
KELLEY DRYE & WARREN, LLP
3050 K Street, NW – Suite 400
Washington, DC  20007
Telephone:  (202) 342-8400
Facsimile: (202) 342-8451

*Attorneys for Movant Fisheries Survival Fund*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCEANA, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civ. No. 1:07-cv-00142-RBW |
| v. | ) |
| | ) |
| THE HONORABLE | ) |
| CARLOS M. GUTIERREZ, *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOVANT
FISHERIES SURVIVAL FUND'S MOTION TO INTERVENE IN THIS ACTION**

## I.    INTRODUCTION

Movant, Fisheries Survival Fund ("FSF"), respectfully submits this Memorandum of Points and Authorities in support of its Motion to Intervene as of right under Fed. R. Civ. P. 24(a)(2) or, in the alternative, for permissive intervention under Fed. R. Civ. P. 24(b).

FSF was founded in March of 1998. (*See* Declaration of Marjorie J. Orman (hereafter, "Orman Decl."), ¶ 2 (attached hereto as Exhibit 1).) Its participants include approximately two hundred full-time Atlantic limited access scallop permit holders from southern New England down through New Jersey and Virginia. (*Id.*) Since its formation, FSF has sought to enhance the information and techniques used by the Defendants to rebuild and provide sustainable yield for the Atlantic sea scallop fishery pursuant to the Sustainable Fisheries Act of 1996 and to preserve FSF participants' economic existence. (*Id.* ¶¶ 3-4, 14, 16.) In this regard, FSF also collaborates with members of the technical and scientific community, including university and government scientists, and privately-retained scientists and consultants to undertake not only

advocacy efforts but cooperative research using scallop vessels, crew and know-how. (*Id.* ¶¶ 4, 6, 19-22, 32, 39-40.) The scientific and technical work in which FSF participants have assisted includes matters relating to scallop stock status, scallop fishery conservation and management, bycatch enumeration and reduction, delineation of habitat, and means by which occasional sea turtle takes can be minimized. (*Id.* ¶¶ 4, 6, 19-22, 32, 36-45.)

Perhaps most pertinent to the case at bar, FSF participants worked with university scientists and a gear technology consultant to develop and test a device referred to as "turtle chains" to protect threatened and endangered sea turtles. (*Id.* ¶ 6.) This device covers the scallop dredge opening, thereby preventing turtles from entering the scallop dredge bag where they can suffer injury and death from mixing with scallops and debris, or by being dumped onto the deck of a fishing vessel along with these other materials. (*Id.* ¶¶ 36-45.) In June 2004, FSF, in conjunction with the Garden State Seafood Association ("GSSA"), petitioned the National Marine Fisheries Service ("NMFS") under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1855(c), to implement a requirement that these chains be used by scallop vessels fishing in areas and at times when encounters with sea turtles are most likely (though still rare). (Orman Decl. ¶ 46.) Although NMFS stated it lacked authority to implement the requested rule under the MSA, *see* 69 Fed. Reg. 63498, 63498 (Nov. 2, 2004), it subsequently enacted a substantially similar, albeit more conservative, rule pursuant to its authority under the Endangered Species Act ("ESA"), 16 U.S.C. § 1533(d), on August 25, 2006. 79 Fed. Reg. 50361 (Aug. 25, 2006).

Oceana, Inc. ("Plaintiff") has brought this suit under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the ESA to challenge, *inter alia*, the *Endangered Species Act Section 7 Consultation Biological Opinion*, Consultation No. F/NER/2005/06066 (Sept. 18,

2006) ("2006 Biological Opinion"), *available at* http://www.nero.noaa.gov/nero/hotnews/

seaturtles/ScallopDec04BO.pdf (last visited March 30, 2007), and the methods by which the

Atlantic sea scallop fishery is monitored. (*See* Compl. ¶ 5 & Counts 2, 3.) This suit follows on

the heels of a case filed by Plaintiff in this Court on September 26, 2006, which directly

challenged the regulation cited above, *supra* at 2, requiring the use of turtle chains by scallop

dredge vessels operating in mid-Atlantic waters during certain times of the year. *Oceana, Inc. v.*

*Gutierrez*, Civ. No. 06-1638-RJL (D.D.C. filed Sept. 22, 2006). Shortly after notification by

Government's counsel of the 2006 Biological Opinion, (Compl. ¶ 76), Plaintiff voluntarily

dismissed that suit and subsequently filed the present action. *Oceana, Inc. v. Gutierrez*, No. 06-

1638-RJL (Doc. No. 10, Dec. 14, 2006) (Notice of Voluntary Dismissal). This case essentially

seeks the same relief sought in the prior case challenging the turtle chain rule, *viz.*, seeking to

impose significant constraints and costly monitoring requirements on participants in the Atlantic

sea scallop fishery, and to continue senseless harm to sea turtles by forcing the agency to require

the removal of turtle chains, at least during observed trips. (*See* Compl. Counts 2, 3 & Prayers

for Relief; *see also* Orman Decl. ¶¶ 49, 50-51, 59.)

Through this action, Plaintiff also seeks to upend the 2006 Biological Opinion that

authorizes the scallop fishery in the mid-Atlantic, which result could prevent FSF participants

from being able to fish in the mid-Atlantic region from May through November each year. (*See*

Compl. Count 2.) Such relief would undermine the conservation objectives of the Atlantic

scallop fishery management plan. (Orman Decl. ¶ 56.) Under the scallop management system

FSF helped to develop, the resource is sustainably maintained through a balance of fishing effort

in areas that are generally open to scallop fishing and those special, discrete areas referred to as

"access areas" that are closed to fishing when high concentrations of juvenile scallops are

discovered and re-opened on a controlled basis after the scallops have grown and matured. (*Id.* ¶¶ 17, 29, 33-34.) Thus, a seven month closure of the Mid-Atlantic region would not only vastly limit fishing opportunities in wide swaths of open fishing grounds, particularly for FSF members in New Jersey, Virginia, and North Carolina, but also would preclude access for more than half the year to the primary controlled access area that is slated to open in 2007. (*Id.* ¶¶ 52-53.) This area, located off the Delaware coast and referred to as the "Elephant Trunk Access Area" ("ETAA"), is projected to be the mainstay of the scallop fishery for the next two years due to the large amount of mature, harvestable scallops it contains. (*Id.* ¶ 33.)

It follows that the relief Plaintiff seeks would have severe economic impacts on the Atlantic scallop fleet. (*Id.* ¶ 58.) This harm is manifest to vessels homeported in the southern area of the fishery who would face a Hobson's choice of deciding whether to travel enormous distances to fish during any such closure, relocate to a northern port for those months at great expense, or forgo fishing opportunities altogether for more than half a year. (*Id.* ¶ 60.) However, all vessels would be negatively affected due to the fact that the majority of landings would be forced to occur in a limited period of time, causing market gluts that are certain to depress prices. (*Id.* ¶ 55.) The winter is also the time when scallop yields are lower, due to reproduction cycles, meaning more scallops would have to be harvested to attain the same poundage of catch. (*Id.*) The scallop industry will also be forced to bear the economic costs and operational burdens attendant to any increased monitoring requirements which Plaintiff seeks via this litigation. (*Id.* ¶ 49, 59.)

Furthermore, forcing vessels to conduct all their trips during the harsh winter and early spring months raises significant safety concerns, not only due to the unpredictable and even dangerous weather and water conditions, but also because many vessels will be fishing in a

relatively small area within the ETAA during a concentrated period of time, increasing the risks of collisions and accidents at-sea. (*Id.* ¶ 54.) FSF seeks to intervene in this action to protect its participants' demonstrated interests in the 2006 Biological Opinion, the continued economic viability and ecological sustainability of their scallop fishing operations, avoiding costly mandates, their safety and health, and to protect their interests in the full-time scallop permits they have been issued by NMFS. (*Id.* ¶¶ 2, 49-60).

## II.     FACTS

### A.     Regulatory Regime

On June 23, 2004, the Secretary of Commerce, acting through his designees at the National Oceanic and Atmospheric Administration ("NOAA") and the NMFS (collectively, "Defendants"), approved and implemented, upon the recommendation of the New England Fishery Management Council ("NEFMC" or the "Council"), Amendment 10 to the Atlantic Sea Scallop Fishery Management Plan ( "Scallop FMP"). *See* 69 Fed. Reg. 35194 (June 23, 2004) (promulgating regulations implementing Amendment 10). Defendants promulgated Amendment 10 in order to meet the Magnuson-Stevens Fishery Conservation and Management Act's mandates to ensure that optimum yield is obtained from the Atlantic scallop fishery for the United States fishing industry on a "continuing basis" and to protect essential fish habitat, among others. 16 U.S.C. §§ 1851(a)(1), (9), 1853(a)(7). Amendment 10 was the first major alteration to the Scallop FMP since the fishery was declared rebuilt and sustainably fished following successful implementation of the conservation program implemented by Amendment 7 in 1999. *See* 69 Fed. Reg. 35198. The major accomplishment of Amendment 10 was to institutionalize an innovative rotational area management fishery strategy that takes advantage of the quick growth of scallops while preventing fishing on large concentrations of juvenile scallops as a means of

optimizing yield from the resource. (Orman Decl. ¶¶ 16-18.)  The FSF and its scientific advisors helped to develop and advocated for this rotational area management strategy, attending and participating in virtually every one of the scores of regulatory development meetings over a series of years and developing and testing the rotational fishing method.  (*Id.* ¶¶ 3, 21-25, 31-32, 34.)

Amendment 10 built on a series of *ad hoc* area access programs which took advantage of scallop growth in areas that were closed either to husband aggregations of young scallops or to achieve conservation objectives in other fisheries.[1]  These measures were enacted under a regulatory tool known as a framework adjustment promulgated under Scallop Amendment 7, which identified the development of rotational fishing methods as a way to enhance scallop rebuilding with a reduced economic impact on scallop fishermen.  *See, e.g.*, 63 Fed. Reg. 70093, 70094 (Dec. 18, 1998) (Proposed Rule); 50 C.F.R. § 648.55.  For its part, subsequently-implemented Amendment 10, and the implementing regulations setting the precise measures for the 2004, 2005, and 2006 fishing years (which begin on the first of March and end on the last day of February, annually, 50 C.F.R. § 648.53(b)(5)) contained in Framework Adjustment 16, replaced this *ad hoc* practice with a more structured system for identifying areas suitable for closure and reopening.  (Orman Decl. ¶ 34.)

Indeed, the rotational scallop management techniques FSF helped pioneer achieve an array of conservation goals (including bycatch minimization and reduction, and reduction of habitat interactions), as well as insuring that scallop biomass levels remain at or above target levels and that fishing effort is balanced throughout the range of the resource.  (*Id.* ¶¶ 17-18.)

---

[1]     *See* 65 Fed. Reg. 37903 (June 19, 2000) (Scallop Framework 13); 66 Fed. Reg. 24052 (May 11, 2001) (Scallop Framework 14); 68 Fed. Reg. 9580 (Feb. 28, 2003) (Scallop Framework 15).

**Memorandum Supporting FSF's Motion to Intervene - Page 6**

These area access programs have allowed scallopers to target fishing efforts onto dense concentrations of relatively large scallops, which result has beneficial impacts for scallopers and scallops alike, and also has the potential to reduce bycatch (including of sea turtles), and habitat impacts (by reducing scallop dredge bottom time). (*See id.* ¶¶ 17-18, 33. )

The regulations which will govern the fishery for the next two fishing years have been established through Framework Adjustment 18 to the Scallop FMP. 71 Fed. Reg. 33211 (June 8, 2006). Relevant to this litigation, Framework Adjustment 18 reopens the ETAA located off the Delaware coast, and thus within the area that Plaintiff believes should be closed for the majority of the year, for controlled fishing. *Id.* at 33212. This area is vitally important to the scallop industry due to the large amount of scallops within it and the concomitant high percentage of access area trips that will occur in the ETAA next year and, presumably, over the next few years. *See id.* (showing that of the seven allocated access area trips for 2007, five are in the ETAA).

NMFS, however, recognized that access to this area could potentially implicate concerns with respect to sea turtles, and thus implemented, at the New England Fishery Management Council ("NEFMC")'s request,[2] a measure specifically tailored to minimize the potential for increased interaction: closure of the ETAA to fishing during the months of September and October when, according to the best available data, such interactions in this area have been the highest. *Id.* at 33214-15. Parenthetically, the FSF had been concerned that the five trips allocated under Framework 18 allocated to full-time limited access permit holders such as FSF's participants in the ETAA for fishing year 2007 may be too high, especially in light of projections by the Council's technical staff that if all the trips are taken, it is possible that the scallop stock could be slightly overfished in 2007. *See* NEFMC, Council Report at 2 (Nov. 2006), *available*

_____

[2]     The NEFMC recommends conservation and management measures defendants under MSA regulatory processes. 16 U.S.C. § § 1852-1854.

**Memorandum Supporting FSF's Motion to Intervene - Page 7**

*at* http://www.nefmc.org/actions/council_reports/council-report-nov06_final.pdf (last visited March 25, 2007); (*see also* Orman Decl ¶ 57.) In order to prevent this possibility, and any conservation and economic harm which might result in the long-run to the scallop resource, the FSF petitioned the NEFMC to request that the Secretary implement an emergency action to reduce the number of trips to this area in 2007 to three. (Orman Decl ¶ 57.) The NEFMC adopted this request, and by a vote of 15-1 (NMFS casting the only "no" vote for procedural reasons), recommending to the Secretary that he implement this reduction pursuant to his authority under the MSA, 16 U.S.C. § 1855(c)(2). *See* NEFMC, Council Report at 2.

In addition, and particularly relevant to this case, finally, on September 18, 2006, NMFS issued a new Biological Opinion that considered new information on the fishery. *See* 2006 Biological Opinion at 2-3. This Opinion repeated findings from previous Biological Opinions that continuation of the Atlantic sea scallop fishery will not jeopardize the continued existence of any of threatened or endangered species. *Id.* at 85. The Incidental Take Statement associated with this Opinion establishes a new and reasonable monitoring system to trigger a reinitiation of consultation if it appears that interactions between the scallop fishery and sea turtles may increase, and also requires NMFS to continue working with the scallop industry to develop further gear modifications thereby insuring that harm to such creatures continues to be minimized. *Id.* at 87-89.

### B.    FSF's Interest

This is the fifth time the FSF has sought to intervene in an action brought by Oceana to irretrievably weaken the commercial scallop fishery, including two actions brought in this Court,

one of which also involved sea turtle issues.[3]   (Orman Decl. ¶¶ 7, 35.)  FSF's approximately two hundred participants have full-time limited access permits issued by Defendants to fish for scallops in the Atlantic.   (*Id.* ¶ 2.)   Ecologically balanced and economically viable scallop conservation and management measures represent absolutely critical and cognizable interests of FSF and its participants. (*Id.* ¶¶ 3-5.)  Indeed, FSF was formed during the relatively preliminary stages of Amendment 7's development, at a time when it became evident that drastic effort was going to be necessary to preserve the fishery.  (*Id.* ¶¶ 11-14.)  The FSF did not organize itself simply to be an advocacy organization.  (*See id.* ¶ 14.)

These efforts culminated in the NEFMC's adoption of a rotational scallop fishing system developed in large part by FSF's scientific and academic partners, through Amendment 10 to the Scallop FMP.   (*Id.* ¶ 34.)   Amendment 10 was promulgated to manage the rebuilt and sustainably-fished Atlantic sea scallop resource, and was built on earlier, *ad hoc* access area programs regarding which helped develop, advocated for, defended in court actions by Oceana. (*Id.*)   FSF participants also have been active in undertaking cooperative research with NMFS and university personnel, including the conduct of proactive gear modification studies to minimize harm to sea turtles that date back to 2001.  (*See, e.g., id.* ¶¶ 36-45.)  The turtle chains and the 2006 Biological Opinion that support their use and at issue in this case were tested thoroughly in over 3000 paired trawls.  (*Id.* ¶45.)  This gear modification has been demonstrably shown to reduce the capture of sea turtles in scallop dredges.  (*Id.*); *see also* 71 Fed. Reg. 50369.

---

[3]     In each of the first four cases, FSF has been permitted to intervene. *See Conservation Law Foundation* ("*CLF*") *v. Mineta*, 131 F. Supp. 2d 19 (D.D.C. 2001); *see also CLF v. United States Dept. of Commerce*, 229 F. Supp. 2d 29 (D. Mass. 2002), *upheld on appeal CLF v. Evans*, 360 F.3d 21 (1st Cir. 2004); *Oceana v. Evans*, Civ. No. 03-10570-GAO, 2004 U.S. Dist. LEXIS 14895 (D. Mass. July 30, 2004); *Oceana v. Evans*, 384 F. Supp. 2d 203 (D.D.C. 2005).

It was this research that led to the development of the turtle chain rule, which FSF participants petitioned NMFS to require as mandatory on the entire scallop dredge fishery. (Orman Decl. at ¶¶ 40-41, 46.)  While that petition was denied, the Secretary ultimately issued a substantially similar requirement in 2006.  71 Fed. Reg. at 50372-73; 50 C.F.R. §§ 222.102, 223.206(d)(11).[4]  The use of these chain mats allows the agency to monitor the fishery in a manner that does not require excessive and costly observer coverage and which helps protect sea turtles from harm.  (*See* Compl. ¶¶ 77-81; *see also* Orman Decl. ¶¶ 49, 59.)  Plaintiff, however, seeks to have the chains removed during observed trips, which could increase the risk of injury and possible death to sea turtles.  (Compl. ¶ 101; Orman Decl. ¶ 50.)  "If the past is any indication, this harm would be used against the scallop industry in both the regulatory process and in public efforts to demonize the men and women involved."  (Orman Decl. ¶ 51.)

Moreover, and as is explained further in the introductions, Plaintiff seeks to vacate the 2006 Biological Opinion, upon which the Atlantic scallop fishery is authorized, as well as to impose "such injunctive relief as is appropriate to allow the continued prosecution of the Atlantic Sea Scallop Fishery during the remand period while preventing irreparable harm to the environment."  (Compl. Counts 2, 3 & Prayer for Relief 4; *see also* Orman Decl. ¶ 60.)  In its 2006 litigation, which was voluntarily vacated in December 2006, *see supra* at 3, one of the conditions Plaintiff sought was to disallow all scallop dredge fishing in the mid-Atlantic from June to November.  *Oceana, Inc. v. Gutierrez*, No. 06-1638-RJL (Doc. No. 1, Dec. 14, 2006) (Complaint).  FSF reasonably expects that Plaintiff will ask for the same, or similarly onerous, conditions to be placed on the scallop fishery in this litigation should it prevail.

---

[4]      NMFS subsequently issued a technical correction to the section that specifies the configuration of the turtle chains or "chain mat."  *See* 71 Fed. Reg. 66466 (Nov. 15, 2006).

**Memorandum Supporting FSF's Motion to Intervene - Page 10**

For these reasons, FSF's interests in the rule at issue are substantial.

C.    **The Instant Action Will Harm Movant's Interests**

As demonstrated above, FSF has a significant conservation and economic interest in preserving the turtle chain regulation. FSF literally invested hundreds (if not more) of man-hours in developing and testing this important gear modification and then securing the rule's implementation. (Orman Decl. ¶¶ 36-46.) The relief Plaintiff seeks could lead to the setting aside of this rule for which FSF has advocated, if a monitoring system that does not meet Plaintiff's standards cannot be implemented. More directly, Plaintiff also seeks more stringent monitoring requirements, the cost of which the industry will be asked to bear in large part, and unspecified other restrictions on the fishery. (Compl. ¶¶ 94-104 & Claim for Relief 4.) For instance, Plaintiff submitted comments on the turtle chain proposed rule advocating for a closure of the fishery, 71 Fed. Reg. at 50364, and, should the current rule be vacated, FSF would anticipate that Plaintiff will continue to seek such a result in the regulatory and judicial arenas. A closure of such magnitude would result in injury to FSF's members' economic and conservation interests, as well as their interests in a safely prosecuted fishery. *Supra* at 3-4.

Plaintiff also has engaged in a public campaign to vilify the Atlantic scallop fishing industry, using harm to turtles as its focus. *See, e.g.,* Oceana, Net Casualties, at 19 (2006), *available at* http://oceana.org/fileadmin/oceana/template/sea_turtles/images/Net_Casualties_ FINAL_spreads_01.pdf (last visited Dec. 4, 2006). Certain groups have been using these campaigns to try to disrupt the markets for certain fish products, as well as to pursue their regulatory agendas. Should the turtle chain rule be enjoined by this Court, or even their employment during observed trips, the potential for injury and even death to sea turtles, specifically, those injuries that occur as a result of a turtle entering the scallop dredge bag and

being brought aboard and dumped on deck, will increase.[5]  And, if past is prologue, Plaintiff Oceana would use this added danger to the turtles as a reason to ramp up its rhetoric regarding the scallop fishery and advocate for draconian regulatory closures.

Plaintiff is seeking to impose costly and intrusive monitoring requirements on the scallop industry, including heightened observer coverage and video monitoring. *Supra* at 3.  The industry undoubtedly would be forced to bear the costs of these monitoring systems, as it does in substantial measure with the current observer system.  (Orman Decl. ¶ 49, 59.)

## III.    ARGUMENT

### A.    FSF Has Satisfied The Standards For Intervention Of Right

#### 1.    Standards for Intervention of Right

Fed. R. Civ. P. 24(a)(2) establishes and delimits an applicant's ability to intervene "as of right." It states:

> Upon timely application, anyone shall be permitted to intervene in an action . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

In this Circuit, an applicant seeking intervention of right under Rule 24(a)(2) must meet four requirements: "(1) the timeliness of the motion; (2) whether the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) lack of adequate representation." *Mova*

---

[5]    *See* NMFS, Final Environmental Assessment and Regulatory Impact Review Regulatory Flexibility Analysis of Sea Turtle Conservation Measures for the Mid-Atlantic Sea Scallop Dredge Fishery, at 59-65 (Apr. 2006), *available at* http://www.nero.noaa.gov/prot_res/ ProResDiv/turtles/06scalturtleea.pdf (last visited Dec. 4, 2006).

*Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1074 (D.C. Cir. 1998) (internal quotations omitted) (quoting Fed. R. Civ. Pro. 24(a)); *see also Williams & Humbert, Ltd. v. W. & H. Trade Marks, Ltd.*, 840 F.2d 72, 74 (D.C. Cir. 1988); *see also Nuesse v. Camp*, 385 F.2d 694, 699 (D.C. Cir. 1967); *People for the Ethical Treatment of Animals (PETA) v. Babbitt*, 151 F.R.D. 6, 7 (D.D.C. 1993).

"The D.C. Circuit has taken a liberal approach to intervention." *Wilderness Society v. Babbitt*, 104 F.Supp.2d 10, 18 (D.D.C. 2000) (citing *Natural Resources Defense Council ("NRDC") v. Costle*, 561 F.2d 904, 910-911 (D.C. Cir. 1977)). Indeed, the D.C. Circuit has emphasized that the standards for intervention must be interpreted flexibly (*i.e.*, "require other than literal application"), and consistent with the 1966 broadening of the standards for intervention of right, in resolving applications to intervene filed in actions seeking judicial review of administrative action. *Nuesse*, 385 F.2d at 178-79 (granting application of Wisconsin state banking commissioner in action involving federal Comptroller's decision regarding applications for federal bank branches).

In this regard, this Court has permitted industry groups, on several occasions, to intervene as defendants in lawsuits filed by environmental groups against government agencies challenging regulatory decisions. *See Oceana v. Evans*, 384 F. Supp. 2d 203 (D.D.C. 2005); *Nat'l Coalition for Marine Conservation v. Evans*, 231 F. Supp. 2d 119 (D.D.C. 2002); *Huron Environmental Activist League v. EPA*, 917 F. Supp. 34 (D.D.C. 1996); *NRDC v. EPA*, 99 F.R.D. 607 (D.D.C. 1983). In addition, as noted above, FSF has been allowed to intervene by this Court and others in four prior cases involving the Atlantic sea scallop fishery, *supra* n.2, and industry groups were also permitted by this Court to intervene at the remedial phase in New England groundfish-related litigation. *See CLF v. Evans*, 211 F. Supp. 2d 55 (D.D.C. 2002).

**Memorandum Supporting FSF's Motion to Intervene - Page 13**

### 2.    FSF's Application is Timely

The first element of the intervention test concerns the issue of timeliness.  Timeliness is measured "from when the prospective intervenor knew or should have known that any of its rights would be directly affected by the litigation." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) (citation omitted).  This inquiry, however, does not solely focus on the length of time since the commencement of the suit.  Instead, timeliness "is to be determined from all the circumstances." *NRDC*, 561 F.2d at 907.  To this end, the D.C. Circuit has stated:

> While timeliness is a prerequisite to any claim for intervention under Rule 24, it is settled – particularly where intervention is sought as of right – that the amount of time which has elapsed since the litigation began is not in itself the determinative test of timeliness.  Rather, the court should also look to the related circumstances, including the purpose for which the intervention is sought, the necessity for intervention as a means of preserving the applicant's rights, and the improbability of prejudice to those already parties in the case.

*Hodgson v. United Mine Workers of America*, 473 F.2d 118, 129 (D.C. Cir. 1972) (citations omitted); *see also NRDC*, 561 F.2d at 907; *PETA*, 151 F.R.D. at 7 (*citing United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1295 (D.C. Cir. 1980)).

FSF's motion is timely under any of these tests.  The organization has acted promptly in filing this motion when it became aware that its interests were threatened.  Indeed, this motion has been filed within a week of the Government's filing of its answer and a full month-and-a-half before the May 18, 2007, initial scheduling conference.  Thus, prejudice to the other parties is highly improbable as FSF's participation will not delay the proceedings.  Further, FSF is seeking intervention as of right to protect substantive interests in the rule at issue, as well as those interests which could be adversely affected by a determination in the Plaintiff's favor.  *See NRDC*, 561 F.2d at 907 (holding that motion to intervene timely in light of purpose of motion and lack of prejudice to parties).

**Memorandum Supporting FSF's Motion to Intervene - Page 14**

3.    **FSF Has a Sufficient Interest Relating to the Subject Matter in this Action To Warrant Intervention**

The second intervention prong – the cognizable interest test – "is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse*, 385 F.2d at 700. To satisfy this requirement, the applicant must show that it has a "legally protectable" interest in the litigation. *See Mova Pharmaceutical*, 140 F.3d at 1074 (*quoting Southern Christian Leadership Conf. v. Kelley*, 747 F.2d 777, 779 (D.C. Cir. 1984)). In other words, the applicant must "demonstrate it has standing to participate in th[e] action." *Id.* This test is not stringent: "In a motion to intervene under Rule 24(a)(2), the question is not whether the applicable law assigns the prospective intervenor a cause of action. . . . As the Rule's plain text indicates, intervenors of right need only an 'interest' in the litigation—not a 'cause of action' or 'permission to sue.'" *Jones v. Prince George's County, Maryland*, 348 F.3d 1014, 1017-18 (D.C. Cir. 2003).

In this action, FSF participants will face concrete injury if the rule to which they petitioned to have implemented is overturned. Vacation of the 2006 Biological Opinion puts the continuation of the Atlantic sea scallop fishery at risk, particularly if this Court were to require the imposition of stringent operational limitations on the fishery (up to and including crippling new fishery closures) which Plaintiff is certain to request and has requested in, for instance, its comments on the turtle chain rule and in prior Oceana cases in which FSF has been permitted to intervene. *See, e.g., supra* at 3, 10-11. Further, FSF participants could faced with increased costs in terms of both regulatory compliance and the regulatory process if NMFS and the NEFMC struggle to develop alternative sea turtle monitoring measures should the current measures be invalidated, and higher compliance costs under a new monitoring regime. *Supra* at 4, 11. The relief sought will also implicate vessel and crew safety issues. *Supra* at 4-5. Finally,

**Memorandum Supporting FSF's Motion to Intervene - Page 15**

FSF participants will suffer harm to the good name of their industry as a matter of public opinion and in the market if their proactive conservation efforts are set aside and the potential for increased harm to sea turtles (however modest an increase) occurs. *Supra* at 11-12.

Furthermore, this Court in the *Conservation Law Foundation* scallop and groundfish cases, *supra*, and in other cases, has found that industry groups, including the FSF itself, have a sufficient interest to intervene in litigation brought by environmental groups against government agencies to challenge regulatory decisions made by these agencies. Most such industry groups have been permitted to intervene even without the types of tangible conservation engineering activities in which FSF and its participants have engaged in this instance. *See NRDC v. Costle*, 561 F.2d at 913; *Wilderness Society v. Babbitt*, 104 F. Supp. at 18; *Huron Environmental Activist League*, 917 F. Supp. at 42; *NRDC v. EPA*, 99 F.R.D. at 609.

In *NRDC v. EPA*, for example, industry groups representing pesticide manufacturers sought to intervene in an action brought by an environmental group requesting that the court set aside a series of EPA regulatory decisions reached pursuant to approximately seven years of meetings with the industry representatives, and to enjoin the implementation of such measures. Regarding the industry groups' interest in the litigation, the court concluded:

> Here, the intervenors have shown the requisite interest in the litigation. Plaintiffs' complaint challenges procedures pursuant to which EPA reached preliminary decisions that the intervenors' pesticide products merited continued registration. If plaintiffs succeed in this case, these regulatory decisions, which are obviously in the intervenors' interests, will be set aside. Thus, the intervenors can be said to have a substantial and direct interest in the subject of this litigation.

99 F.R.D. at 609; *see also Huron Environmental Activist League*, 917 F. Supp. at 42 (finding sufficient industry group interest where, if plaintiff environmental group prevailed, "the defendant would be enjoined from relying in any way on the product of its meetings with various industry representatives").

**Memorandum Supporting FSF's Motion to Intervene - Page 16**

Moreover, FSF members have a legitimate interest in the continued use of their full-time Atlantic sea scallop permits to warrant intervention as of right. As stated above, FSF's members have been issued permits to conduct full-time fishing for sea scallops in the Atlantic.[6] Ownership of a permit, the use of which is at issue in this litigation, represents a protectable interest. *See Sierra Club v. EPA*, 995 F.2d 1478, 1485 (9th Cir. 1993) (finding a sufficient interest relating to the subject matter by "permit-holding property owners . . . where the statute directly regulates their conduct"). "[W]hen, as here, the injunctive relief sought by Plaintiff will have direct, immediate, and harmful effects upon a third party's legally protectable interests, that party satisfies the 'interest' test of Rule 24(a)(2) . . ." *See Forest Conservation Council v. United States Forest Service*, 66 F.3d 1489, 1494 (9th Cir. 1995) (permitting community organizations deriving an economic return from logging activities to intervene as of right in an environmental organization's suit to limit and enjoin these logging activities); *see also Nuesse*, 385 F.2d at 699.

Moreover, in the seminal decision regarding Article III standing to bring APA-based claims, the Supreme Court held that the relevant inquiry under that Article is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). Without doubt, FSF participants are subject to the regulatory regime at suit. The Supreme Court has further explained that "those who use the land [here, the ocean] in question and allege injury to aesthetic, conservational, and recreational, as well as economic values have legally protectable

---

[6]    FSF has associational standing to assert its members' interests. FSF's members involved in the Atlantic sea scallop fishing industry have sufficient interests to intervene individually in this action seeking judicial limitation of their permit-based ability to participate in this fishery. Moreover, the interest of its members that FSF is seeking to protect are germane to FSF's purposes. (*See* Orman Decl. ¶¶ 2-4); *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *Sierra Club v. Glickman*, 82 F.2d at 110.

**Memorandum Supporting FSF's Motion to Intervene - Page 17**

interests." *Sierra Club v. Morton*, 405 U.S. 727, 738 (1972).[7]  As the First Circuit explained in

*Conservation Law Foundation*,

> [T]he adverse effect is certain.  The fishing groups seeking intervention are the
> real targets of the suit and are the subjects of the regulatory plan.  Changes in the
> rule will affect the proposed intervenors' business, both immediately and in the
> future.

966 F.2d at 43.

In an analogous case, the D.C. Circuit held that a trade association representing industry

members had standing to challenge federal actions which affected their economic interests and

fell with the "zone of interest" contemplated by the controlling law.  *See Nat'l Coal Ass'n v.*

*Hodel*, 825 F.2d 523, 526-27 (D.D.C. 1987) (trade association of coal producers had standing

under Mineral Leasing Act to challenge decision by Secretary of Interior when the association

alleged competitive injury and fell within the Act's "zone of interest").

In particular, associations of commercial fishermen and those representing them have

been held to have Article III standing with respect to regulations implementing fishery

conservation and management measures pursuant to various statutory schemes.  *Parravano v.*

*Babbitt*, 861 F. Supp. 914, 928 (N.D. Cal. 1994).

Finally, in *Masoulf v. Babbitt*, 85 F.3d 1295 (8th Cir. 1996), the Eighth Circuit held that a

proposed intervenor under Rule 24(a)(2) must independently satisfy Article III standing

requirements, summarized these requirements, and then held that an environmental organization

that sought to intervene in a snowmobiler's action challenging limits on that activity on federal

land satisfied these Article III standing requirements.  It explained:

---

[7]    In fact, the traditional fighting issue in environmental law standing cases is whether
conservation organizations, with an interest short of an economic interest in the activity involved
in the litigation, have standing to intervene or bring an action in the first place.  Thus, although
litigation relating to standing has raised a series of definitional issues in a variety of contexts,
these issues are not implicated by this application.

**Memorandum Supporting FSF's Motion to Intervene - Page 18**

> First, the would-be litigant must have suffered an "injury in fact"; that is, an "invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical. . . ." . . . Second, the would-be litigant must establish a causal connection between the alleged injury and the conduct being challenged. . . .   Third, he must show that the injury is likely to be redressed by a favorable decision.

*Masoulf*, 85 F.3d at 1301 (citations omitted).   On both the facts and the law, FSF has demonstrated Article III standing and the necessary cognizable interest under Fed. R. Civ. P. 24(a)(2).

### 4.   This Case's Disposition Without Movant's Participation Would, As a Practical Matter, Impair and Impede Movant's and Its Members Ability to Protect Their Interests

The third prong of the intervention as of right test – whether disposition of the action may, as a practical matter, impair or impede the movant's ability to protect its interests – focuses on the "practical consequences" of denying intervention.  *See NRDC v. Costle*, 561 F.2d at 909. The First Circuit, in *CLF v. Mosbacher*, quoted *supra* at 16, explained the practical consequences of denying commercial fishing organizations the opportunity to intervene and protect their interests, and cited numerous analogous cases in which industry groups were allowed to intervene to protect their interest.  *See* 966 F.2d at 43 (citing cases).

Moreover, this Court has found on more than one occasion that industry groups could not effectively protect their interests unless they were permitted to intervene in actions filed by environmental groups challenging regulatory decisions by government agencies, because the disposition of the action may impair or impede the industry groups' ability to protect their interests. *See Huron Environmental Activist League,* 917 F. Supp. at 42; *see also NRDC v. EPA*, 99 F.R.D. at 609.

**Memorandum Supporting FSF's Motion to Intervene - Page 19**

FSF's and its participants' efforts to secure the implementation of a regulatory regime that provides for both protection of sea turtles and continued robust Mid-Atlantic fishing opportunities will be thwarted if Plaintiff's underlying litigation succeeds.

Furthermore, it is not unknown for these same Defendants to settle actions brought by environmental plaintiffs even though the settlement had dramatic negative impacts for the commercial fishing industry. *See, e.g., CLF v. Mosbacher*, 966 F.2d at 43-44. In this case, FSF has demonstrated a strong, abiding interest in management of the Atlantic sea scallop fishery, and in the turtle chain rule, in particular, which largely came about through its participants' efforts to fund and conduct the necessary research and advocate for the rule in the regulatory arena. Movant should not be denied the opportunity to add its unique perspective and defend its interests solely on the basis that the Government shares an interest in defending the rule.

### 5.    Defendants Do Not and Perhaps Institutionally Cannot Adequately Represent the Interests of FSF's Members

Defendants will not adequately represent the interests of FSF and its participants in this case. The final intervention prong concerns the adequacy of representation by existing parties to the litigation. This burden of demonstrating inadequate representation is "minimal" and prospective intervenors need only show "that representation of their interests by existing parties *may be* inadequate," *see NRDC v. EPA*, 99 F.R.D. at 610 (emphasis added) (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)), "not that the representation will in fact be inadequate." *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986) (citations omitted).

As the D.C. Circuit has recognized, there is a "relatively large class of cases in this circuit recognizing the inadequacy of governmental representation of the interests of private parties in certain circumstances." *Dimond*, 792 F.2d at 192 (citing *NRDC v. Costle, supra*, 561 F.2d at 912

n.41; *Neusse, supra*, 385 F.2d at 702-04).   Indeed, the D.C. Circuit has explained precisely how an agency and those whom it regulates have different interests that require independent representation, even if the regulated community supported the relevant regulations.   *NRDC v. Costle*, 561 F.2d at 912; *see also Dimond*, 792 F.2d at 192-93 (governmental entity charged by law with representing the public interests of its citizens might not fulfill its responsibility were it to advance the narrower interest of one element of the regulated community); *Natural Resources Defense Council*, 99 F.R.D. at 610 (concluding that the EPA, whose policies and procedures were being challenged, may not have the same interest as the intervening industry group in demonstrating that the EPA's decisions were lawful).

    In fact, the Tenth Circuit has gone so far as to observe that an agency seeking to protect both the public interest and the interest of a private intervenor undertakes a "task which is on its face impossible."   *Nat'l Farm Lines v. Interstate Commerce Comm'n*, 564 F.2d 381, 384 (10th Cir. 1977).   Further, given the minimal nature of the showing that must be made, at least one court has held that "[t]he burden of persuasion that representation is adequate appears to rest on the party *opposing* intervention."   *Caterino v. Barry*, 922 F.2d 37, 42 n.4 (1st Cir. 1990) (emphasis in original).

    As explained above, the First Circuit in *CLF v. Mosbacher* ably explained why the very Defendants named in this action could not adequately represent the interests of the commercial fishing community in another action by environmental organizations seeking increased restrictions on the fishing operations of the commercial fishermen that sought to intervene.   966 F.2d at 44-45.   *See also Kleissler*, 157 F.3d at 972 (and cases cited therein).   As such, FSF seek to intervene to protect their interests in the case and in any remedial stages of litigation.

**Memorandum Supporting FSF's Motion to Intervene - Page 21**

**B.      In the Alternative, Movant Satisfies the Requirements for Permissive Intervention**

Rule 24(b)(2) grants the Court discretion to allow permissive intervention upon timely application "when an applicant's claim or defense and the main action have a question of law or fact in common."    Fed. R. Civ. P. 24(b)(2).    In deciding whether to allow permissive intervention, a court should consider "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."    *Id.*

For the reasons outlined above, FSF's intervention motion is timely and intervention will not unduly prejudice the adjudication of the rights of Plaintiff or the Defendants.    Furthermore, FSF's arguments arise out of the same facts as Plaintiff's Complaint and raise the same issues as are framed in that pleading.    Thus, should this Court find that FSF is not entitled to intervene in this action as a matter of right, it should exercise its discretion and allow permissive intervention. *See Natural Resources Defense Council, Inc. v. Tennessee Valley Auth.*, 340 F. Supp. 400, 408-409 (S.D.N.Y. 1971), *rev'd on other grounds,* 455 F.2d 255 (2d Cir. 1972) (granting permissive intervention to National Audubon Society where there were common questions of law and fact with the main action and the Society demonstrated an interest in the underlying subject matter).

## IV.      CONCLUSION

For each of the foregoing reasons, FSF respectfully requests that this Court issue an order granting its Motion to Intervene as a defendant.

Dated:  March 30, 2007

Respectfully submitted,

David E. Frulla  (D.C. Bar No. 414170)
Shaun M. Gehan (D.C. Bar No. 483720)
Daniel S. Blynn (D.C. Bar No. 488934)
KELLEY DRYE & WARREN, LLP
3050 K Street, NW – Suite 400
Washington, D.C.  20007
Telephone:  (202) 342-8400
Facsimile: (202) 342-8451

**Memorandum Supporting FSF's Motion to Intervene - Page 23**

# EXHIBIT 1:

# Declaration of Majorie J. Orman

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCEANA, INC., | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) Civ. No. 1:07-cv-00142-RBW |
| **v.** | ) |
| | ) |
| THE HONORABLE | ) |
| CARLOS M. GUTIERREZ, *et al.* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## DECLARATION OF MARJORIE J. ORMAN IN SUPPORT OF
## FISHERIES SURVIVAL FUND'S MOTION TO INTERVENE

I, Marjorie J. Orman, declare and state as follows:

1.    I make this Declaration based on my personal knowledge and in support of the Fisheries Survival Fund's ("FSF") Motion to Intervene in the above captioned action.

2.    I am an original organizer, a director, and the principal officer of FSF. Approximately two hundred full-time Atlantic scallop fishermen from southern New England down through New Jersey and Virginia holding fishing permits issued by the federal Government formed the FSF in 1998. FSF was organized to address regulatory proposals that threatened to bankrupt the industry at a time when scallop stocks were seen as low and in need of major rebuilding. FSF planned to address these issues through advocacy, the development of better scientific information about the scallop resources, and better approaches to scallop conservation and management.

3.    On the advocacy front, since 1998, FSF has participated in the Atlantic scallop regulatory process literally every step of the way. FSF representatives have attended virtually every public meeting involving the scallop fishery, proposed a variety of strategies, and submitted comments to multiple rulemakings, and done legislative outreach. On several occasions, FSF has urged the government to take appropriate regulatory action, even when it would reduce harvesting opportunities.

4.    Perhaps even more importantly, FSF has helped improve the information and strategies used to conserve and manage the scallop resource and fishery. To that end, FSF has combined the experience and knowledge of its participants with that of outside scientific and academic experts. Its participants have developed improved, conservation-positive management strategies for the scallop fishery.

5.     Since FSF's formation in 1998, Atlantic scallop stocks have more than rebuilt, and scallopers' interactions with non-target species have declined substantially. Scallopers' fortunes and prospects have improved as a result of these developments.

6.     One element of FSF's efforts is central to this case. Specifically, FSF participants worked with a gear technologist and an academic partner to design, test, and advocate for mandatory use of the "turtle chain" excluder devices that are at issue in this lawsuit. Turtle chains result in somewhat lower scallop catches, and yet FSF pushed to make their use mandatory.

7.     Oceana has brought claims under the Endangered Species Act ("ESA"), the National Environmental Policy Act ("NEPA"), the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), and the Administrative Procedure Act ("APA") challenging Federal regulation of the scallop fishery in 2000, 2001, 2003, and 2004. Each time, Oceana's efforts to shut down a critical element of the Atlantic sea scallop fishery failed.

8.     FSF has been permitted to intervene as representative for scallop fishermen in each of those lawsuits and appeals when filed. FSF's intervention is equally appropriate here, especially given its role in the development, testing, and advocacy for mandatory use of the turtle chains that are central to this case.

## I.     BACKGROUND ON ATLANTIC SEA SCALLOP REGULATION

9.     Federal fisheries are managed under the MSA by the National Marine Fisheries Service ("NMFS"), an agency within the Department of Commerce's National Oceanic and Atmospheric Administration, in conjunction with regional fishery management councils.

10.    A fishery management council, such as the New England Fishery Management Council ("NEFMC"), functions as a quasi-legislative body. The NEMFC has primary authority under the MSA for recommending measures to the Secretary of Commerce and NMFS to conserve and manage, among others, Atlantic sea scallop and Northeast multispecies (or "groundfish") stocks.

11.    In 1998, when FSF was formed, the NEFMC was considering proposals to enhance the rebuilding of Atlantic sea scallop stocks. The enhanced rebuilding regime was to be contained in what was termed as Amendment 7 to the Atlantic Sea Scallop Fishery Management Plan ("Scallop FMP").

12.    The Amendment 7 proposals under consideration by the NEFMC in 1998 dramatically reduced the number of days-at-sea ("DAS") available to full-time scallop fishing vessels. The NEFMC ultimately adopted a version of Amendment 7 that required a reduction in DAS to 51 for fishing year 2000-01 (from a level of 120 DAS for fishing year 1999-2000 and significantly higher levels in prior years), and further reductions to 49 DAS and 46 DAS, respectively, for fishing years 2001-02 and 2002-03, with DAS staying at or near this level through at least 2008. Such DAS level threatened to bankrupt the full-time Atlantic scallop fishing industry.

**Declaration of Marjorie J. Orman – Page 2**

13.     NMFS also recognized the crippling effect of such low DAS levels and concluded that that full-time scallop fishermen would generally need well over 100 DAS each year to break-even. In fact, Amendment 7 expressly stated that "the full-time scallop vessels will not be able to maintain their economic viability under any of the alternatives proposed by this amendment during the first six to nine years of the program." NEFMC, Amendment 7 to the Atlantic Sea Scallop Fishery Management Plan, at 76 (Oct. 7, 1998), *available at* http://www.nefmc.org/scallops/planamen/scallop_amend7.pdf.

14.     FSF was formed largely in response to the onerous DAS restrictions in Amendment 7. From the start, FSF recognized that to fulfill its goals, FSF and its participants would have to be very active in the deliberations and processes of the NEFMC.

15.     Since those dire days, scallop stocks have rebuilt and scallop management has been converted from a rebuilding regime under Amendment 7, to a rotational area management regime under Amendment 10 to the Scallop FMP, which was implemented in 2004.

16.     FSF worked with the NEFMC and NMFS to develop and implement rotational management measures in an *ad hoc* way during the rebuilding period under Amendment 7, and then the strategies were made a formal part of the management plan under Amendment 10.

17.     Somewhat like a land farming crop rotation strategy, a rotational scallop harvest strategy promotes scallop rebuilding and yields in several ways. First, by causing fishermen to catch larger scallops, the yield from each scallop is increased. Increasing scallop yield is a primary rebuilding and long-term management goal of Amendment 7. Second, if larger scallops are harvested, scallop fishermen can attain the poundage of product needed to remain economically viable while killing fewer individual scallops, thereby reducing what is known as the fishing mortality rate, or "F." Amendment 7 also required reductions in F. Third, harvesting larger scallops permits smaller scallops to mature and reproduce before they are harvested. Finally, an individual scallop permitted to mature has the capacity to spawn a great many offspring, which further helps scallop rebuilding.

18.     A rotational harvest strategy also has ecological benefits. By fishing in areas of high scallop concentrations, fishermen are able to reduce the amount of time their scallop dredges spend fishing. By that step alone, the dredge's impact on the ocean bottom is reduced and the potential that the dredge will inadvertently harvest other fish species, such as groundfish, summer flounder, monkfish, and skates is decreased. More importantly for the instant case, the opportunities for encountering endangered species, such as sea turtles, are minimized.

19.     FSF and its participants also have assisted in cooperative research designed to support area management and other conservation objectives such as bycatch (including of sea turtles) reduction and ocean floor mapping to help address the concerns about scallop fishing on the ocean bottom habitat.

**Declaration of Marjorie J. Orman – Page 3**

II.    **FSF'S COOPERATIVE RESEARCH AND ADVOCACY EFFORTS SUPPORTING THE DEVELOPMENT OF ECOLOGICALLY POSITIVE SCALLOP FISHING AND SEA TURTLE PROTECTION MEASURES**

1.    **Regulatory History, FSF's Efforts, And Litigation**

20.    On the scientific, cooperative research front, FSF encouraged the scallop industry to provide vessels, crews, gear, practical advice, and perspective to support scientific research conducted aboard fishing vessels. Cooperative science, based on, and involving industry input, is a powerful tool – one that empowers an organized industry to participate effectively in the complicated and sometimes slow-moving and data-poor federal regulatory process.

21.    FSF and its participants began working extensively with Drs. Brian Rothschild and Kevin Stokesbury of the University of Massachusetts Intercampus Graduate School of Marine Sciences and Technology ("SMAST"), Dr. Bill DuPaul of the Virginia Institute of Marine Sciences of the College of William & Mary ("VIMS"), and with NMFS' own scientists.

22.    FSF's work with SMAST began in earnest in 1998 when a cooperative research effort was undertaken to use commercial scallop vessels to determine the actual state of the scallop resource in a section of an important scallop fishing area off the New England coast, known as Georges Bank.

23.    Georges Bank was selected because approximately one-half of the Bank had been closed to scallop fishing since 1994 to protect groundfish stocks. Prior to the closures, scallopers had fished in these areas for decades due to their productivity, in fact these closed areas have historically contained among the most productive scallop fishing grounds in the United States, if not the world.

24.    At that time, scallop fishermen were convinced, as was Dr. Rothschild and his colleagues at SMAST, that the closures of these areas on Georges Bank should have resulted in a vast upswing of scallops in these historically productive areas. Scallop fishermen have long understood from a practical perspective (and they are increasingly understanding from a scientific perspective) that rotating scallop fishing effort helps rebuild scallop stocks.

25.    To address this belief, SMAST, with FSF's assistance, designed a survey protocol and proposal to measure the scallops in these offshore areas using fishing vessels as research platforms.

26.    Notwithstanding the survey's solid scientific design, in late summer 1998, a fishing group aligned with environmental groups – the Cape Cod Commercial Hook Fishermen's Association – sought a temporary restraining order to prevent SMAST's cooperative survey.

**Declaration of Marjorie J. Orman – Page 4**

27.    The United States District Court for the District of Massachusetts permitted the FSF to intervene in the action on the Government's side to support the survey. That court refused to issue injunctive relief, and ultimately the surveying proceeded in Georges Bank Closed Area II in late summer of 1998. *See Cape Cod Commercial Hook Fishermen's Ass'n v. Daley,* 30 F. Supp. 2d 111 (D. Mass. 1998).

28.    The results of SMAST's systematic sampling were reported to NEFMC. The sampling information ultimately led to the openings of discrete portions of all three Georges Bank Closed Areas (Closed Area I, Closed Area II, and the Nantucket Lightship Closed Area), in fishing years 1999 and 2000. (A fishing year starts on March 1 and ends on the last day of February of the following year.)

29.    These openings occurred under very strict preconditions, such as a total cap on scallop catches per area, caps on incidental catch of groundfish, access to discrete portions of the areas to minimize impacts on habitat, among others. The procedures developed in these areas became a template for "access area" rotational fishing under Amendment 10.

30.    In the years since 1998, SMAST has developed and continually improved a video sampling approach, which uses cameras dropped from scallop fishing vessels. The video sampling is used to estimate scallop abundance and obtain the most detailed information available on a wide-scale regarding the ocean bottom.

31.    FSF participants also have worked with Dr. DuPaul of VIMS to systematically sample scallop fishing areas in the Mid-Atlantic and on Georges Bank, and to measure the effect of scallop fishing in the Georges Bank Groundfish Closed Areas.

32.    A series of areas also have been closed to scallop fishing to promote scallop growth and yield in the Mid-Atlantic area, and certain of these area have been re-opened each year from fishing year 2001 through the present. FSF's participants have worked with scientists from SMAST and VIMS in cooperative survey efforts in the Mid-Atlantic as well. This information has helped to fine-tune management in these areas when used in tandem with NMFS/NOAA survey information.

33.    An extremely important access area is set to open off the Delaware coast in 2007. It is called the "Elephant Trunk Access Area" because of its shape. The Elephant Trunk Access Area contains some of the densest concentrations of harvestable scallops ever observed and will be key to the scallop fishery in the coming years, especially as other scallop grounds do not look to be as productive in the next few years, due to a combination of regulatory restrictions on certain abundant scallop areas involving issues other than scallop management and declines in scallop abundance in certain other areas.

34.    These effort were very successful, and during a four-year period, from 2000 to 2004, FSF participants, the NEFMC, and other members of the public, including Oceana, worked to develop a long-term replacement for Amendment 7 that would institutionalize the rotational management system, achieve important Magnuson-Stevens Act objectives such

**Declaration of Marjorie J. Orman – Page 5**

as minimizing bycatch and protecting essential fish habitat, and to sustain the rebuilding, and ultimately rebuilt, scallop resource. This rule became known as Amendment 10.

35. Oceana, however, challenged each and every one of the framework adjustments and Amendment 10 itself, on habitat issues, NEPA grounds, the ESA, and other theories. FSF was allowed to intervene each time. The only success that Oceana had in any of those cases related to two narrow issues – whether Amendment 10 had a "standardized bycatch reporting methodology," and whether the NEFMC and NMFS could adjust habitat closed area boundaries by a framework adjustment. It failed on all its major claims.

### 2.    Cooperative Research and Development and Testing of Turtle Chains

36. It was natural for FSF to extend its cooperative research efforts to address sea turtle issues, when, after years with few or no interactions, there was a minor spike in the incidence of catches of sea turtles in scallop dredges in the Mid-Atlantic in 2000 and 2001.

37. Consistent with its purposes and mandate, FSF began working with its members, other fisheries organizations – specifically the Garden State Seafood Association ("GSSA") – NMFS, and its partners in the academic community, to begin to study and address these surprising interactions between sea turtles and scallop dredges.

38. Among the first steps taken by FSF was the development of an informational guide in the form of a laminated "bridge card" regarding best practices in avoiding sea turtle contact and minimizing harm to those sea turtles which inadvertently may be caught in the scallop dredges. FSF distributed these guides to all member vessels, and made them available to others outside FSF and GSSA.

39. For the longer term, FSF worked with Cape Cod gear technologist Capt. Ron Smolowitz (a former captain of a NMFS research vessel) to begin design and testing, in cooperation with NMFS, of a modified dredge that promises to minimize harm to turtles encountered on the ocean bottom. This work is ongoing.

40. Capt. Smolowitz, along with Dr. William DuPaul of VIMS, also worked with FSF participants to design and test a turtle excluder device for scallop dredges.

41. The excluder device is a grid of chains that fits over the opening of the scallop dredge in order to prevent sea turtles from entering the bag of the dredge.

42. All parties, including Oceana, have recognized the greatest potential for harm to sea turtles can occur if they are caught in a scallop dredge, towed along the bottom, and then brought to the surface and dumped on the deck of a scalloper.

43. These so-called "turtle chains" prevent turtles from entering the dredge bag in the first place, while not unduly lessening the efficiency with which the dredge harvests scallops.

**Declaration of Marjorie J. Orman – Page 6**

44.    Capt. Smolowitz, Dr. DuPaul, and their colleagues have tested these turtle chains aboard FSF participants' vessels.

45.    In over 3000 tows over a period of 195 fishing days in which a single vessel pulled two scallop dredges, one with the turtle chains and a control dredge without. The turtle chains worked. Not a single turtle was taken in the treated dredge, while a total of seven turtles were caught in the control dredge.

46.    Based on the success of these tests, the FSF and GSSA petitioned NMFS on June 17, 2004, to mandate the use of turtle chains in this region from May 1 through October 15 each year pursuant to NMFS' authority under the MSA.

47.    On November 2, 2004, NMFS determined that the MSA did not grant it either the requisite authority or flexibility to implement a turtle chain rule on an emergency basis. However, NMFS stated that it would consider implementing a similar measure under the ESA. 69 Fed. Reg. 63498 (Nov. 2. 2004).

48.    To this end, a proposed rule was issued on May 27, 2005. 70 Fed. Reg. 30,660 (May 27, 2005). FSF submitted comments in strong support of the proposed rule. A final rule implementing the regulations at issue in this case was promulgated on August 25, 2006. 71 Fed. Reg. 50,361 (August 25, 2006).

### 3.    FSF Participants' Interests in Oceana's Present Case

49.    Like it has virtually every year over the past six years, in this case, Oceana has challenged NMFS's compliance with the APA and the ESA. It seeks, for instance, to vacate the Biological Opinion under which the fishery is able to be prosecuted, and to impose costly monitoring requirements on the industry, such as observers and video monitoring, along with other restrictions on the fishery.

50.    Ironically, while Oceana acknowledges that turtles are harmed when they enter the dredge bag, among the remedies they seek would result in removal of the turtle excluder devices from scallop dredges, at least on observed trips, subjecting the turtles to the very threats all parties are trying so hard to prevent.

51.    If the past is any indication, this harm would be used against the scallop industry in both the regulatory process and in public efforts to demonize the men and women involved.

52.    And, as it has in other cases, Oceana is seeking additional remedies, that if granted, are designed to shut down scalloping in the Mid-Atlantic, including scalloping in the extremely important Elephant Trunk Access Area, from May to November of each year.

53.    Such a far-ranging closure of fishing grounds as an alternate way to protect turtles would cause major economic hardship to all of the FSF's members, particularly those located in New Jersey, Virginia, and North Carolina.

**Declaration of Marjorie J. Orman – Page 7**

54.    Limiting access to these scallops only to the winter and early spring months would cause safety problems as well, especially in the Elephant Trunk Access Area, due to the poor weather conditions during these seasons and the crowding that would occur should all vessels be forced to conduct their trips during such a compressed period of time.  Such crowding would increase the likelihood of vessel collisions.

55.    In addition, limiting Mid-Atlantic fishing to the winter months would reduce the yield per scallop, because of scallops' annual growth and reproductive cycles, meaning more scallops would have to be harvested to attain the same poundage of catch.  Also, as most fishing would occur during the same clear weather periods, the flood of scallops is likely to depress prices.

56.    Such a closure also would cause conservation problems throughout the range of the fishery.  If all scallop vessels were forced to fish in New England waters for seven months, then there is a very real risk that those fishing grounds will become severely overfished.

57.    In fact, already sufficiently concerned about the possibility of overfishing in 2007, FSF petitioned the NEFMC to reduce the number of Elephant Trunk Access Area trips in 2007.  The NEFMC agreed to take action by an overwhelming 14 to 1 margin, and NMFS adopted this request by rule issued on December 22, 2006.  71 Fed. Reg. 76945.

58.    Finally, success by Oceana in this case also would cause economic harm, as scallop vessels could be forced to remain tied up for the majority of the closed period because, for instance, NMFS has allocated only two trips to the Georges Bank access areas and 52 days to use the "open areas" (i.e., those scallop grounds which are not part of the rotational management system) in 2007.

59.    Moreover, heightened observer requirements, which is one of the apparent recommendations of Oceana in this case, as it has been in previous cases, causes economic harm to scallopers because they bear the cost of carrying observers.  Although these costs are partially offset by allowances to catch additional scallops, that "set-aside" reduces economic opportunities for all scallopers and is not guaranteed to cover the full costs of the observer program.

60.    I am very concerned that many full-time scallop fishermen, including my clients and other FSF participants, will be negatively impacted by a determination by this Court that the Biological Opinion and the monitoring system it establishes violates the APA and the ESA.  This is particularly true for those FSF participants that are located far from the New England fishing grounds.

I declare under the penalty of perjury that the foregoing is true and correct.

*Marjorie J. Orman*

Marjorie J. Orman

Dated:  March 29, 2007

**Declaration of Marjorie J. Orman – Page 8**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OCEANA, INC.,                           ) | |
|                                   ) | |
|       Plaintiff,                   ) | |
|                                   ) | Civ. No. 1:07-cv-00142-RBW |
| v.                                        ) | |
|                                   ) | |
| THE HONORABLE             ) | |
|   CARLOS M. GUTIERREZ, *et al.*    ) | |
|                                   ) | |
|       Defendants.             ) | |
|                                   ) | |

## [PROPOSED] ORDER

Movant Fisheries Survival Fund has filed a motion for intervention in this action. Based upon Movant's submission, it is hereby ORDERED this ___ day of _____, 2007, that the Motion for Intervention is GRANTED.

Dated: _____

                                        _____

                                        Hon. Reggie B. Walton
                                        United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCEANA, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civ. No. 1:07-cv-00142-RBW |
| v. | ) |
| | ) |
| THE HONORABLE | ) |
| CARLOS M. GUTIERREZ, *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

**FISHERIES SURVIVAL FUND'S DISCLOSURE AND CERTIFICATION OF
CORPORATE AFFILIATIONS AND FINANCIAL INTERESTS**

Pursuant to LCvR 7.1, movant Fisheries Survival Fund ("FSF") submits the following

certification:

I, Shaun M. Gehan, counsel of record for FSF certify that to the best of my knowledge

and belief, FSF does not have any parent companies, subsidiaries or affiliates, which have any

outstanding securities in the hands of the public.


Dated: March 30, 2007                    Respectfully submitted,

David E. Frulla  (D.C. Bar No. 414170)
Shaun M. Gehan (D.C. Bar No. 483720)
Daniel S. Blynn (D.C. Bar No. 488934)
KELLEY DRYE & WARREN, LLP
3050 K Street, NW – Suite 400
Washington, DC  20007
Telephone:  (202) 342-8400
Facsimile: (202) 342-8451


Attorneys for Movant, Fisheries Survival Fund